*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
September 5, 2024

v

No. 369099
Grand Traverse Circuit Court
LC No. 2022-014280-FH

MICHAEL JAMES CARROLL,

        Defendant-Appellant.

Before: REDFORD, P.J., and GADOLA, C.J., and RIORDAN, JJ.

PER CURIAM.

In this interlocutory appeal, defendant, Michael James Carroll, appeals by leave granted[1] the trial court's order denying his motion to suppress evidence. Defendant argues that the trial court should have suppressed his blood alcohol test results because the Michigan State Police Lansing Forensic Laboratory ("the MSP Lab"), which conducted the analysis, did not follow the applicable administrative rule or the lab's own procedures. Defendant also contends that the MSP Lab failed to properly maintain the equipment used for his analysis and applied unreliable principles and methodology. For the reasons stated in this opinion, we vacate and remand for articulation of the factual basis for admission of the blood alcohol test.

## I. BACKGROUND

The prosecution charged defendant with operating a motor vehicle while intoxicated, third offense, MCL 257.625(1) and (9)(c). According to the information, the alleged offense occurred on August 4, 2022, during a traffic stop. The deputy saw that defendant had glassy and bloodshot eyes, heard defendant slur his speech, and smelled intoxicants. After defendant was arrested, a

---

[1] *People v Carroll*, unpublished order of the Court of Appeals, entered April 17, 2024 (Docket No. 369099).

blood sample was taken and tested at the MSP Lab. Ryan Gifford, an expert in forensic toxicology, performed the analysis, which revealed 0.26 grams of alcohol per 100 milliliters of blood.

Defendant moved to suppress the analysis results under MRE 702,[2] arguing that it was based on unreliable principles and methodologies.[3] Defendant contended that the MSP Lab had violated Mich Admin Code, R 325.2674. Defendant retained an expert in forensic toxicology, Francis Conrad, who submitted an affidavit in support of defendant's motion after reviewing numerous discovery materials provided by the prosecution concerning defendant's blood alcohol analysis. The prosecution opposed defendant's motion, arguing that the MSP Lab had used reliable principles and methodologies and was accredited.

The trial court held four evidentiary hearings over the span of four months. During these hearings, the trial court heard testimony from multiple forensic toxicology experts: Francis Conrad for defendant; Geoffrey French, Greta Gill, and Ryan Gifford for the prosecution.

During the first hearing in May 2023, testimony in the record indicates that the blood alcohol analysis performed at the MSP Lab was completed by Ryan Gifford and supervised by Greta Gill. The procedural manual that the MSP Lab is required to follow provides in relevant § 2.1.5. that before starting each batch of samples, a lab technician must inspect equipment "for proper function and cleanliness, and repair or replace parts when necessary." MSP Lab Toxicology Procedural Manual, issued July 29, 2022, § 2.1.5. Standard scientific procedure for authenticating blood alcohol results is a two-person review where one person produces test results and someone else authenticates results.

Conrad testified for the defense that the injection timestamps for the positive control samples, which are used to calibrate the equipment on a daily basis, were missing from the batch of samples that contained defendant's blood alcohol sample. He also noted that the MSP Lab only provided partial chromatograms of the positive controls and calibrators. He testified that without these timestamps and full chromatograms, the data could not be reliable. He stated MSP failed to produce traditional chromatograms with injection timestamps when asked by the judge.

French testified for the prosecution that despite the missing injection timestamps, the lab results were still reliable because they included acquisition date and time. He stated that although injection and acquisition time can be different, in this case, "those two things are synonymous."

---

[2] MRE 702 governs the admissibility of expert witness testimony. The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). Given that the proceedings occurred before these changes were made effective, we apply the version of MRE 702 in effect at the time of the evidentiary hearings.

[3] Defendant's sample was part of a "batch" of up to 140 other samples. By challenging his own sample, defendant necessarily challenged the entire batch as unreliable.

Regarding French's testimony, Conrad testified that he had never seen any other expert in the scientific community claim that injection and acquisition times are synonymous.

French noted that the MSP Lab is annually certified by ANAB[4] and has full accreditation. He testified that the summary report templates with the missing timestamps were created in collaboration with an applications expert from Agilent, the manufacturer of the Gas Chromatograph (GC) instruments used by the MSP Lab for analysis. French noted that removal of the timestamps from the worksheets in 2019 was attributable to an oversight. French testified that "there was no conscious effort to intentionally remove any information from that data." He also noted that the MSP Lab has since updated their report templates by adding "two columns to the summary reports for the calibrators and controls." Contrary to Conrad, French continued to testify there was "absolutely no question whatsoever that the result in this case was a very accurate result for blood alcohol."

At an additional hearing in June 2023, Conrad testified that the two Agilent machines used by the MSP Lab, GC-19-1 and GC-19-2, require daily, monthly, quarterly, and annual maintenance, which includes inspection and assessment in accordance with Agilent specifications. He also testified that per MSP Lab protocol, lab equipment is to "be maintained at a level meeting or exceeding the equipment manufacturer's specifications." Conrad explained that daily maintenance on GC machines includes performance verification in which positive samples of the substances that will be tested each day are run through the machine to evaluate if they appear correctly on a full-length chromatogram and if the concentrations match between what the machine quantifies and what is expected of the sample from the manufacturer.

Conrad explained that although the maintenance log showed evidence of GC machine repairs in 2022, there was "no routine maintenance or preventative maintenance that was completed." He also testified that there was no daily maintenance performed on August 10, 2022, the day defendant's sample was tested. More specifically, negative or blank controls were not run prior to starting the batch to detect contamination. Furthermore, for 75% of the casework samples within the batch containing defendant's sample, negative controls and blank controls were not run. In compliance with accreditation requirements, the MSP Lab runs one negative control after the ninth casework sample per batch of approximately 140 samples. Conrad explained that it is standard scientific practice to run blanks and negative controls after every ten samples to check for contamination that results from alcohol accumulation within GC machines. Conrad testified that without running blanks, it is not possible to verify that there was no crossover contamination. He maintained that defendant's sample would not have been protected from cross-contamination with the one negative control that was run as the first sample at the beginning of the batch. Conrad testified that current MSP procedure is insufficient for measuring alcohol carryover throughout the batch.

---

[4] The ANAB is the ANSI National Accreditation Board. The ANSI is the American National Standards Institute. Accordingly, ANAB appears to be the American National Standards Institute National Accreditation Board. See ANAB, *FAQ* <https://anab.ansi.org/about-anab/faq/#A1> (accessed August 20, 2024).

In regards to the incomplete chromatograms, Conrad testified that no scientist he is familiar with would "consider a cropped data set that removes half of the chromatogram reliable or valid." He emphasized that any errors in the first and last minutes of the chromatograms, which last approximately four to five minutes, would not be visible, therefore calling into question the reliability of the data.

He also emphasized that MSP's lack of maintenance on the machines, specifically their failure to replace the blunt sample probes, leads to "catastrophic failure," such as the random isopropanol peaks discovered in chromatograms from both machines in late 2022. Conrad also criticized the MSP Lab's failure to report the malfunction to the accreditation body and their failure to stop using the machines when the isopropanol peaks were first observed.

At the same June hearing, Gill testified that GC-19-1 had annual preventative maintenance done by an Agilent field tech on February 23, 2022. She acknowledged there was no annual preventative maintenance performed in 2021 because the MSP Lab changed the "service contract" from silver to bronze. The bronze plan did not include preventative maintenance. Gill testified that the GC machines do not require daily, monthly, or quarterly maintenance. She indicated this was part of the MSP Lab's interest in purchasing these machines.

Gill testified that to ensure that the machines are in working order and that there is no cross-contamination, the MSP Lab runs a series of six calibrators and ten controls made of "certified reference materials" that are run throughout each batch. The lab opens new working stock weekly and runs calibrators, controls, and blood ethanol controls once with every batch that is analyzed. A full calibration is performed every day that the instruments are used. Gill also explained that all vial samples are run once through both GC machines.

Gill testified that cross-checking the sample data between machines alerted the MSP Lab to the random isopropanol peaks, although she could not recall when the peaks first started to appear. In October 2022, Agilent performed maintenance on both machines, replacing the injection probes, which were thought to be related to the isopropanol peaks. Later, it was determined that the malfunction was being caused by upside-down caps on some of the vials attributable to a manufacturing error, unrelated to the instrument itself. Contrary to Conrad, Gill testified that this sort of error did not need to be reported to the accreditation body. After the isopropanol peaks were detected, the machines continued to be used, but samples with detected peaks were retested for reliability. Gill testified that defendant's sample was not affected by the cap malfunction since "the data generated from the analysis of [defendant's] sample did not have that characteristic."

Gill acknowledged she did not directly handle defendant's vial. In her role as a supervisor, Gill noted that she reviewed the calibrator and control pack for the batch with defendant's sample. She completed a series of qualifications, including ensuring that controls are within the acceptable ranges, that the right method is used, and that peaks are the correct shape.

Gifford also testified at the June hearing. He stated that he completed the analysis on the batch containing defendant's sample on August 10, 2022. Gifford explained that "we scientists do not perform the regular maintenance. That's handled by a service contract." He testified that the variance in the data or the physical differences in the vial apparent with an upside-down cap

malfunction were not observed in defendant's sample. Before each sample was analyzed by the instrument, he picked up each vial two at a time, checked each vial, and inspected the seal. He testified that negative controls and blank samples were tested in the same batch as defendant's sample, as required, to check for any carryover. Gifford later confirmed that by blanks he meant negatives, which contain propanol. Blanks were not run in the batch with defendant's sample nor does the MSP Lab run negative controls at the end of the batch.

In regards to the cropped chromatogram, Gifford agreed with Conrad that MSP Lab chromatograms do not show the first and last minute of the analysis. However, Gifford testified that any peaks indicating contamination that occur outside the window of analysis would not interfere with the analytes they are looking at and, therefore, he would have no reason to suspect the reliability. While initially noting that there would be no cause for concern if errors or contamination were outside the window of analysis, he later testified that he would likely bring it up to a supervisor.

After multiple days in which both defense and prosecution experts testified at length regarding the laboratory results, processes, and protocols, the trial court concluded suppression was unwarranted:

> But in the Court's analysis or function as the gatekeeper, what the Court has is data provided by a lab that has been accredited and all of the policies and procedures that we're talking about were vetted through the accreditation process. And I don't think it's the Court's role to punish the lab in the method of not admitting this particular piece of evidence for that reason.
>
> And so based on the scientific testimony provided by the supervisors and the verification of the data and the quality control aspect in terms of how they found it to be reliable as the lab does, based on it being an accredited facility, the Court does believe that that constitutes a preponderance. And so I will allow the admission of that.
>
> I would say that that is not without hesitation, more on a personal level but the Court has to set aside the frustration that it feels with the lab for the lack of professionalism quite frankly even in the way they behaved in the courtroom. But I'm not going to not admit the evidence in this case as a way to punish those individuals because that's not the way that the Court is going to make those determinations nor do I think it's appropriate.[5]

Defendant moved for reconsideration, raising identical arguments as those on appeal. The trial court denied the motion. This appeal followed.

---

[5] This Court acknowledges the trial court, prior to stating its conclusions on the record, articulated concern and frustration with the manner in which some of the prosecution witnesses conducted themselves during their testimony and how they responded to the trial court's orders.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"This Court reviews for clear error findings of fact regarding a motion to suppress evidence. However, we review de novo the trial court's ultimate decision on a motion to suppress." *People v Fosnaugh*, 248 Mich App 444, 450; 639 NW2d 587 (2001). Clear error occurs "if, after a review of the record, this Court is left with a definite and firm conviction that a mistake was made." *People v Meeker (On Remand)*, 340 Mich App 559, 563; 986 NW2d 622 (2022). Additionally, this Court reviews for an abuse of discretion a trial court's decision "regarding the qualification of an expert and the admissibility of expert testimony . . . ." *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008) (quotation marks and citation omitted). A trial court abuses its discretion when its decision is "outside the range of reasonable and principled outcomes." *Id*. at 217. "A trial court necessarily abuses its discretion when it makes an error of law." *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017).

### B. DISCUSSION

For purposes of MRE 702, Michigan law has adopted the requirements set forth in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). *Unger*, 278 Mich App at 217. "[T]he proponent of expert testimony must establish that the testimony is reliable by showing that it 'is based on sufficient facts or data,' that it 'is the product of reliable principles and methods,' and that the proposed expert witness 'has applied the principles and methods reliably to the facts of the case.' " *Id*., quoting former MRE 702.

The trial court acts as a "gatekeeper," but this "does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217 (quotation marks and citation omitted). The opinion need not even be "necessarily correct or universally accepted." *Id*. (quotation marks and citations omitted). Rather, the trial court must determine "whether the opinion is rationally derived from a sound foundation." *Id*. (quotation marks and citations omitted). "The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *Id*. at 217-218. Additionally, in the context of Breathalyzer test results, this Court explained:

> In order for the results of chemical tests of blood alcohol to be admitted into evidence, the proponent of such tests must meet four foundational requirements. First, it must be shown that the operator was qualified. Second, the proper method or procedure must be demonstrated as having been followed in the tests. Third, the tests must have been performed within a reasonable time after the arrest. Finally, the testing device must be shown to be reliable. [*People v Tipolt*, 198 Mich App 44, 46; 497 NW2d 198 (1993).]

Later, this Court stated, in the same context, that such test results were admissible only if such results were "both relevant and reliable." *Fosnaugh*, 248 Mich App at 450.

The trial court heard competing experts testify about the MSP Lab's process for testing blood samples across four days of testimony. These competing experts opined extensively regarding the process of analyzing blood samples, the procedure applicable to detect contamination, and whether those procedures were applied to the batch of blood samples. Following this testimony, the trial court concluded that the policies and procedures had been satisfied, the initial burden of demonstrating enough reliability had been met, and the threshold of admissibility satisfied. In support of this conclusion, the trial court explained that the data was provided by a lab that performed testing vetted through an accreditation process. While it is evident that accreditation would play a role in determining whether the MSP Lab's blood alcohol analysis of defendant's sample was reliable, there is no suggestion that accreditation alone suffices to satisfy the requirements of MRE 702. See *People v Muniz*, 343 Mich App 437, 444; 997 NW2d 325 (2022) ("Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible.") (quotation marks and citation omitted).

Beyond its statement on accreditation, the trial court did not explain how it determined that the blood alcohol analysis was reliable—that is, how the evidence satisfied MRE 702—effectively preventing this Court from reviewing the issue. The trial court did not state what scientific testimony, verification of data, or quality control aspect it relied upon in reaching its decision. This leaves this Court without the ability to review the trial court's decision. Accordingly, we vacate and remand for an articulation of the trial court's reasoning in support of its decision. On remand, this opinion does not limit the trial court's discretion, upon articulation of its rationale, to grant or deny the motion to suppress the blood alcohol test. Also on remand, the trial court is neither required nor precluded from taking further evidence; that issue is left to the trial court's discretion.

We vacate and remand. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Michael J. Riordan

-7-